# Authority Under International Law to Take Action If the Soviet Union Establishes Missile Bases in Cuba

In the event that missile bases should be established in Cuba by the Soviet Union, international law would permit use by the United States of relatively extreme measures, including various forms and degree of force, for the purpose of terminating or preventing the realization of such a threat to the peace and security of the western hemisphere.

An obligation would exist to have recourse first, if time should permit, to the procedures of collective security organizations of which the United States is a member.

The United States would be obliged to confine any use of force to the least necessary to the end proposed.

August 30, 1962

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

The attached memorandum makes reference to an appendix of historical materials which has not yet been typed in final form. It will be delivered later today.

As you will see, the memorandum has some of the tone of a brief; it devotes little space to any counter-arguments that might be made. This approach seemed desirable in order to avoid any appearance of doubt or indecision in case any public use of the material should be made. I do not mean to suggest that we doubt our conclusions, but only that greater emphasis could have been given to the opposing arguments that exist. Nick and I discussed the memorandum this morning and agreed that it might be a good idea to prepare a supplemental memorandum on the opposing arguments and some of the non-legal factors that may be relevant.

The form of any statement that might be made, and the question whether one should be made at all, depend greatly on what information and evidence are available. There are strong reasons for withholding any statement until the President is ready to take some action. If this subject is raised and discussed and nothing happens, the international community may grow used to the problem of Soviet missiles in Cuba and it will become more difficult for us as time passes to generate the sense of urgency needed to get action approved in the Organization of American States ("OAS"). On a political level, there might be charges of inaction and of "no win" policy. On the other hand, if no statement is made we would lose the chance that a mere warning would be sufficient. I think the Soviet Union and Cuba are already aware that any attempt to install missiles in Cuba might provoke the most extreme countermeasures on our part.[*]

---

[*] Editor's Note: This opinion has previously been published in 6 Green Bag 2d 195 (2003), but without the cover memorandum (the material that precedes this note) and without the appendix of historical materials that starts on page 260. We have not been able to locate the supplemental memorandum that is mentioned in the second paragraph above.

* * * * *

This is in response to your request for the views of this Office as to certain legal issues bearing upon a proposed declaration by the President of the intentions of this government in the event that missile bases should be established in Cuba by the Soviet Union. In general, it is our view that international law would permit use by the United States of relatively extreme measures, including various forms and degree of force, for the purpose of terminating or preventing the realization of such a threat to the peace and security of the western hemisphere. An obligation would exist to have recourse first, if time should permit, to the procedures of collective security organizations of which the United States is a member. The United States would, further, be obliged to confine any use of force to the least necessary to the end proposed.

Part I of this memorandum deals with the function and content of the concept of self-defense in international law generally. The next part examines certain regional differences which have developed in the application of that concept as a result of historical attitudes and practices and other factors. The memorandum concludes with several concrete suggestions as to the form and content of the proposed statement by the President.

## I.

International law relating to the use of force centers about the polar concepts of aggression and self-defense. Although forcible violation of a state's boundaries or of its most highly developed systems of municipal law permit the use of force in self-defense within relatively narrow limits, in the international community, where there exists no centralized authority capable of maintaining order, states must have, and are accorded by law, a proportionately greater freedom to protect their vital interests by unilateral action. Not only customary international law but the United Nations Charter and substantially all other conventions and treaties which relate to this subject recognize the indispensable role of self-defense under present conditions.

The concept of self-defense in international law of course justifies more than activity designed merely to resist an armed attack which is already in progress. Under international law every state has, in the words of Elihu Root, "the right . . . to protect itself by preventing a condition of affairs in which it will be too late to protect itself."[1] Cases commonly cited as illustrative of this principle include that of the Virginius,[2] in which Spanish forces seized an American vessel on the high

---

[1] Elihu Root, *The Real Monroe Doctrine*, 8 Am. J. Int'l L. 427, 432 (1914).

[2] 2 John Bassett Moore, *A Digest of International Law* §§ 309, 315, at 895–903, 980–83 (1906); William Edward Hall, *A Treatise on International law* § 86, at 328–31 (A. Pearce Higgins, ed., 8th ed. 1924).

seas en route to Cuba carrying arms for the use of insurgents. Britain demanded reparations for arbitrary treatment of its subjects found on board the vessel after the seizure was effected, but conceded the legality of the seizure itself. The United States withdrew its initial protest and eventually adopted the British view of the incident as its own. Similarly, in the case of the Caroline,[3] Canadian forces invaded the United States and destroyed the vessel, which was to be used by Canadian insurgents and American sympathizers in an attack on Canada. Many other illustrations of the principle could be cited.[4]

Although it is clear that the principle of self-defense may justify preventive action in foreign territory and on the high seas under some circumstances, it is also clear that this principle is subject to certain limitations. For example, such defensive action is subject to a rule of proportionality. Thus in the Caroline case the United States called upon Great Britain not only to justify the taking of preventive action, but also to show that its forces "did nothing unreasonable or excessive; since the act, justified by the necessity of self-defence, must be limited by that necessity and kept clearly within it."[5]

A further limitation on preventive action, at least unilateral action not sanctioned by any collective security arrangement, relates to the degree of urgency that must exist before it is invoked. In the next section of this Memorandum it is argued that, under the special regime applicable to the Western Hemisphere, the mere maintenance of facilities for certain kinds of armed attack, without more, may justify preventive action. However, apart from such special regimes, it is clear that preventive action in self-defense is warranted only where the need for it is "instant, overwhelming, leaving no choice of means, and no moment for deliberation."[6] It thus is clear that preventive action would not ordinarily be lawful to prevent the maintenance of missile bases or other armaments in the absence of evidence that their actual use for an aggressive attack was imminent.

Another limitation upon the concept of self-defense, as derived from customary law, is imposed by the United Nations Charter (59 Stat. 1031) and the charters of regional collective security organizations, such as the Organization of American States ("OAS"), of which the United States is a member. The charters of these organizations in each case preserve the right of individual states to use force in self-defense, and, although certain ambiguities are presented by the language used, it appears that none of the charters prohibits the taking of unilateral preventive

---

[3] Hall, *supra* note 2, § 84, at 322–25; 1 Charles Cheney Hyde, *International Law Chiefly as Interpreted and Applied by the United States* § 66, at 239–40 (2d ed. 1945).

[4] *See, e.g.*, D.W. Bowett, *Self-Defense in International Law* (1958).

[5] Letter for Henry Stephen Fox, Envoy Extraordinary and Minister Plenipotentiary, from Daniel Webster, Secretary of State, Apr. 24, 1841, *reprinted in* 29 *British and Foreign State Papers* 1129, 1138 (1840–41).

[6] *Id*. Mr. Webster's statement was quoted with approval by the International Military Tribunal at Nuremberg. Judgment of Oct. 1, 1948, *reprinted in* 41 Am. J. Int'l L. 172, 205 (1947).

action in self-defense prior to the occurrence of an armed attack. However, although it is arguable that there is no express commitment in these charters to utilize the procedures they afford in situations calling for preventive action, adherence to such an organization undoubtedly carries with it a commitment to have recourse to the organization's procedures if at all possible before acting unilaterally.[7] Indeed, an obligation to this effect might well be deduced from the general rules as to preventive action, summarized above, to the effect that such action is lawful only as a last resort. In any event, the United States is heavily committed to the use of collective security procedures as a matter of policy.

A further principle recognized in the U.N. Charter (art. 51) is that action may be taken in self-defense, pursuant to a regional collective security arrangement, by a state which is not directly threatened. If a sufficient threat against any member state is established, the organization and all its members may act. In this respect, the Charter has the effect of expanding the area in which preventive action is regarded as lawful.

Both the U.N. Charter and the Charter of the OAS (Apr. 30, 1948, T.I.A.S. No. 2361, 2 U.S.T. 2416, 119 U.N.T.S. 48) authorize collective action upon less provocation than would be required to justify unilateral action. The Security Council may take action against any "threat to the peace" or "breach of the peace" as well as any "act of aggression" (U.N. Charter art. 39). Such action may include not only the economic and political sanctions listed in article 41 but also "demonstrations, blockade, and other operations by air, sea, or land forces," as provided in article 42. Action proposed in the Security Council is, of course, subject to veto by any one of the five permanent members. Upon a less explicit legal basis, the General Assembly may take similar action under the "Uniting-for-Peace" resolution. Under article 25 of the Charter of the OAS and article 5 of the Rio Treaty (or "Rio Pact," Inter-American Treaty of Reciprocal Assistance, *opened for signature* Sept. 2, 1947, 62 Stat. 1681, *reprinted in 17* Dep't of State Bull. 565 (Sept. 21, 1947)), which are interrelated, measures for the common defense may be taken not only in the event of an armed attack but also if the "territory or the sovereignty or political independence of any American State" is affected by "an act of aggression that is not an armed attack" or by "any other fact or situation that might endanger the peace of America . . . ." Under article 17 of the Rio Treaty, enforcement action requires a two-thirds vote in the Organ of Consultation.

---

[7] Article 51 of the U.N. Charter requires that action taken in the exercise of the right of self-defense be reported to the Security Council. Unilateral action such as a blockade or an armed attack could, further, be brought before the OAS for review by any member nation. Decisions by two-thirds vote of the Organ for Consultation created by the Rio Pact are binding upon all member states (art. 20), except that no state can be required to use armed force without its consent.

## II.

Since the Monroe Doctrine was announced in 1823, the United States has consistently maintained that it has the right to take all necessary action to prevent any non-American power from obtaining control over territory in the Western Hemisphere. Since 1846, when the so-called Polk Corollary of the Doctrine was added, it has been understood that this right is claimed regardless of whether the foreign intervention occurs with the consent of inhabitants of the area affected. In modern times, it has been understood that the right is claimed not only on behalf of the United States but on behalf of all American states. The right has repeatedly been respected and acknowledged throughout the Americas and the world.

Historical materials with respect to the Monroe Doctrine are collected in the Appendix which is attached. Perhaps the most relevant of these materials are those relating to action taken by the United States and other nations in the Western Hemisphere during the period of 1940–41, prior to their involvement in World War II. In 1940, by the Act of Havana, the American powers agreed to prevent by collective action, or by unilateral action if necessary, changes in the control of territory in the Western Hemisphere as a result of the European hostilities. In 1941, the United States occupied Greenland and dispatched troops to Iceland. Although the occupation of Greenland was justified in part under a treaty with the Danish government in exile, it seems clear that the true basis for the action taken by the United States was the concept of regional self-defense expressed in the Monroe Doctrine.[8]

The historical materials which are appended show that the Doctrine has from the beginning represented a regional variation in the international law of self-defense. The Doctrine asserts that, in order to insulate the Americas from dangers to peace and security stemming from conflicts involving non-American states, the occupation or control of American territory by a non-American power in itself shall be deemed to present a sufficient danger to warrant exercise by the United States and other American powers of the right of self-defense. The result of the consistent adherence to this attitude by the United States and most other American states, together with the acquiescence of the rest of the civilized world, has been to create a specialized, regional body of law under which preventive action in self-defense is, in the Americas, authorized under less restrictive conditions than would be required in some other regions.

In more recent years, the United States has ceased to maintain the Monroe Doctrine in the more extreme forms which it assumed in the late nineteenth and early twentieth centuries. The Doctrine today does not protect purely economic or political interests, as it once did, or even security interests which are less than fundamental. Thus the United States has refrained from direct intervention in Cuba

---

[8] *See, e.g.*, Herbert W. Briggs, Editorial Comment, *The Validity of the Greenland Agreement*, 35 Am. J. Int'l L. 506 (1941).

to prevent the mere continuance in office, apart from any specific military threat, of a government which is allied with the communist bloc and which has not hesitated to destroy economic interests of the United States in the island. The United States has further refrained from forcible intervention to prevent shipment of conventional arms to Cuba, thus tolerating a certain degree of danger that such arms might be used for aggressive purposes against the United States or against other American nations. So far the United States has withheld action in deference to conceptions, entertained strongly in some quarters in Latin America, of self-determination and non-intervention. However, thus far it has been arguable that under modern conditions, no critical danger to the peace and security of other countries in the Western Hemisphere was presented; that shipments of conventional arms to the Castro government could not necessarily be ascribed to any purpose beyond the defense of Cuba. The same cannot be said of missiles, certainly not of ground-to-ground missiles. The use of Cuban territory to mount such weapons, usable by the Soviet Union only to attack other states and not merely for the defense of Cuba against attack, falls wholly outside the reasons for mitigation by the United States of some aspects of the Monroe Doctrine. Equally important, it falls wholly outside the reasons advanced by our allies in Latin America for opposing interventionist aspects of the Doctrine.

There is nothing unique about the concept of regional differences, based upon historical attitudes and practices, in the impact and requirements of international law. In the Anglo-Norwegian Fisheries Case,[9] for example, the International Court of Justice upheld a system for determining the baselines and boundaries of Norway's territorial sea that could be valid outside Norway, if at all, only in the Scandinavian region. In so doing, the Court relied upon "interests peculiar to [the] region, the reality and importance of which are clearly evidenced by a long usage," and upon the "general toleration of foreign States" over an extended period.[10] Regional variations are also familiar features of the law of the sea with respect to bays and with respect to sedentary fisheries.

In a memorandum for the Attorney General dated April 12, 1961, Assistant Attorney General Katzenbach noted that traditional legal doctrines relating to intervention date from the pre-World War I period and reflect the existence at that time of a security structure based upon flexibility of alignment. Since change of alignment to preserve a balance of power was the principal technique by which security was maintained, legal doctrines tended to develop that would promote freedom to change alignment and would discourage intervention for the purpose of maintaining existing alignments.

The memorandum continues as follows:

---

[9] Fisheries Case (U.K. v. Nor.), Judgment, 1951 I.C.J. 116 (Dec. 18).

[10] *Id.* at 133, 138.

> The political structure today is vastly different. Alignments within the Communist Bloc and within the West are long-term political alignments with considerable aspects of supra-national authority. As a result, the security system from the point of view of each bloc depends less upon neutrality of alignment than it does upon preserving the alignments which exist. Therefore, . . . there is considerable pressure for intervention in situations where bloc security is threatened. There is nothing in the existing legal structure which recognizes this state of affairs, but there are numerous instances where intervention has been tolerated in the postwar period; for example, Hungary, Guatemala, Lebanon, and, in 1948, Israel.

Memorandum for Robert F. Kennedy, Attorney General, from Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, *Re: Intervention by States and Private Groups* at 3 (Apr. 12, 1961).

Although it is true that traditional legal concepts of general application do not expressly recognize interests in bloc security, the Monroe Doctrine constitutes an explicit qualification on a regional basis of general legal concepts insofar as the Western Hemisphere is concerned. The history of the Doctrine includes many incidents which emphasize its purpose to prohibit flatly the adherence of territories in the Americas to European or Asiatic power blocs, or for that matter the transfer by them of allegiance from one bloc to another.[11] The premise underlying this purpose—that peace and security in the Hemisphere could be assured only by insulating it from the unstable alliances and rivalries of Europe and Asia—squarely contradicts the balance-of-power policies that infuse the doctrines of general application which are altered by the Doctrine.

Moreover, although publicists in the field of international law have not yet formulated concepts and doctrines which expressly recognize the changed world situation, it seems probable that international law, as reflected in the actual practices and expectations of states, already recognizes the decisive importance of bloc security today in certain geographic areas. International law is, after all, essentially a generalized statement in terms of rules and policies of the reasonable expectations of states as derived from their practices in making claims and reacting to the claims of others. The Western states have, of course, condemned as unlawful the Soviet intervention in Hungary, directed as it was against a revolt which at the time posed a purely political threat against the Soviet Union. It may be doubted, however, whether the United States would have protested seriously the use of force by the Soviet Union if it had been designed for the limited purpose of compelling abandonment of a plan to install Western missile bases in Hungarian territory.

---

[11] *See generally* John A. Logan Jr., *No Transfer: An American Security Principle* (1961).

If in the future the government of Poland should become increasingly friendly to the United States, our government would undoubtedly defend strongly its legal right to withdraw from the communist political bloc. It seems altogether certain that we would, however, feel obliged to refrain from attempting to supply Poland with ground-to-ground missiles or other armaments readily susceptible of aggressive use. Yugoslavia, and perhaps Finland as well, provide examples of states which the international community as a whole probably regards as insulated, under threat of intervention by the Soviet Union, from full incorporation into the western military structure.

In appraising the rights of the United States vis-à-vis Cuba, the treaty of 1934[12] may have some relevance. The principal effect of the treaty was to abrogate the Cuban-American Treaty of 1903,[13] under which the United States had the right to intervene in Cuba virtually at will. However, the treaty of 1934 preserved existing agreements indefinitely with respect to the leasing of naval stations in Cuba insofar as they applied to the naval station at Guantanamo. The Treaty of 1934 did not expressly obligate Cuba to refrain from permitting the use of its territory for military purposes by other states. However, the fair inference arising from the cession of naval rights to the United States is that the island was to be a part of, or at least not a breach in, the defensive military system protecting the continental United States and the Caribbean countries. At the time of the treaty, of course, a military threat to these areas from Cuba could arise only as a consequence of naval and air installations of the type which the treaty secured to the United States. The evident intention of the parties to the treaty, broadly stated, thus was to restrict intervention by the United States on political or economic grounds, but to preserve the position of Cuba in the defensive military system of the United States. Certainly the treaty is not inconsistent with the position here expressed as to the legal rights of the United States in the event of military use of Cuban territory by the Soviet Union.

It should be apparent that the conclusions here reached do not undermine the legal position of the United States with respect to its own missile bases abroad. In no case of which we are aware is a country in which the United States maintains missile bases subject to a special regime comparable to the Monroe Doctrine. Moreover, in no case is any such country a member or former member of the Communist Bloc or within the acknowledged periphery of the Soviet security system. Finally, there is a basic factual difference in the military relationships of such countries to the Soviet Union and that of Cuba to the United States. The states in which bases are maintained by the United States are in each case among the major targets of Soviet Military preparations. No impartial observer could conclude that Cuba is a major object of the military program of the United States,

---

[12] U.S. Dep't of State, Treaty Info. Bull. No. 56 (May 31, 1934).

[13] U.S. Dep't of State, *Foreign Relations of the United States* 243 (1905).

or that Cuba is in any danger of a missile attack by the United States. The United Kingdom may harbor U.S. missiles in self-defense because it is a likely target of Soviet missiles. For Cuba to harbor Soviet missiles would constitute a wholly disproportionate response to any sane estimate of its defensive needs against the United States.

## III.

We assume that any statement by the President on this subject would begin by announcing that there is reason to believe the governments of Cuba and the Soviet Union may be actively considering the installation of Soviet missiles on Cuban territory, and would be designed generally to warn those countries of the intentions of the United States in any such eventuality. We offer the following suggestions with regard to such a statement by the President:

1. The statement should emphasize the historical and regional aspects of the rights being asserted by the United States.

2. The statement should emphasize the threat to other countries as well as the United States, and the defensive character of any action that might be taken by the United States. Possibly the statement should expressly disclaim any intention to act for economic or political ends, or for any purpose other than to compel an abandonment of plans to create a specific military threat in Cuba.

3. The statement should indicate an intention to have recourse first, if at all possible, to collective security arrangements to which the United States is a party, particularly the Organization of American States. It should also, without qualifying the strong commitment of the United States to the principle of collective security, make the point that the United States has an ultimate responsibility for its own safety which in situations of extreme gravity necessarily would take precedence over all other commitments. Consideration should be given to withholding the statement until it can be made as a first step in an integrated plan to secure collective action by the OAS. If made in that context, the statement should announce a call for a meeting of the Organ of Consultation pursuant to the Inter-American Treaty of Reciprocal Assistance (Rio Pact).

4. The statement should acknowledge an obligation on the part of the United States to observe a rule of proportionality. An express reference might be made to total blockade or to "visit and search" procedures as appropriate reactions by the American states or by the United States to meet a threat to install missile bases in Cuba. In this connection, care should certainly be exercised to avoid the implication that Cuba is under any immediate threat of nuclear attack.

NORBERT A. SCHLEI
*Assistant Attorney General*
*Office of Legal Counsel*

APPENDIX

## Historical Material with Respect to the Monroe Doctrine

### 1. The Monroe Doctrine (1823)

The Monroe Doctrine was proclaimed by President Monroe in his message to Congress on December 9, 1823. This proclamation of fundamental principles of American foreign policy in the Western Hemisphere was induced by several factors—the intervention of the three leading absolute monarchies of Russia, Austria, and Prussia (the so-called "Holy Alliance") in the affairs of other European countries, the fear that they might attempt to overthrow the newly independent Latin-American states and restore them as Spanish colonies, and Russian claims in the Western Hemisphere.[14] President Monroe's message stated in part:

> [T]he occasion has been judged proper for asserting as a principle in which the rights and interests of the United States are involved, that the American continents, by the free and independent condition which they have assumed and maintain, are henceforth not to be considered as subjects for future colonization by any European powers . . . .

> . . . The political system of the allied powers is essentially different in this respect from that of America. . . . We owe it, therefore, to candor, and to the amicable relations existing between the United States and those powers, to declare that we should consider any attempt on their part to extend their system to any portion of this hemisphere as dangerous to our peace and safety. With the existing colonies or dependencies of any European power we have not interfered and shall not interfere. But with the Governments who have declared their independence, and maintained it, and whose independence we have, on great consideration and on just principles, acknowledged, we could not view any interposition for the purpose of oppressing them, or controlling in any other manner their destiny, by any European power, in any other light than as the manifestation of an unfriendly disposition towards the United States. . . .

> . . . It is impossible that the allied powers should extend their political system to any portion of either [American] continent without endangering our peace and happiness; nor can anyone believe that

---

[14] Alejandro Alvarez, *The Monroe Doctrine* 6–7 (1924).

our southern brethren, if left to themselves, would adopt it of their own accord. It is equally impossible, therefore, that we should behold such interposition, in any form, with indifference.[15]

## 2. The Polk Corollary (1848)

In 1848 Mexican officials in Yucatan indicated a willingness to permit annexation of territory under their jurisdiction by Great Britain or Spain in return for protection against the rebellious native Indian population. To forestall any possibility of European intervention in Mexico, President Polk sent a special message to Congress on April 29, 1848, enunciating what is known as the Polk Corollary of the Monroe Doctrine. The President's message declared in part:

> I submit for the consideration of Congress several communications received at the Department of State from Mr. Justo Sierra, commissioner of Yucatan, and also a communication from the Governor of that State, representing the condition of extreme suffering to which their country has been reduced by an insurrection of the Indians within its limits, and asking the aid of the United States.
>
> . . . .
>
> In this condition they have, through their constituted authorities, implored the aid of this Government to save them from destruction, offering in case this should be granted to transfer the "dominion and sovereignty of the peninsula" to the United States. Similar appeals for aid and protection have been made to the Spanish and the English Governments.
>
> Whilst it is not my purpose to recommend the adoption of any measure with a view to the acquisition of the "dominion and sovereignty" over Yucatan, yet, according to our established policy, we could not consent to a transfer of this "dominion and sovereignty" either to Spain, Great Britain, or any other European power. In the language of President Monroe, in his message of December, 1823—
>
> > We should consider any attempt on their part to extend their system to any portion of this hemisphere as dangerous to our peace and safety.
> >
> > . . . .

---

[15] 2 *A Compilation of the Messages and Papers of the Presidents (New Series)* 778, 787, 788 (James D. Richardson ed., 1897).

Our own security requires that the established policy thus announced should guide our conduct, and this applies with great force to the peninsula of Yucatan. It is situate in the Gulf of Mexico, on the North American continent, and, from its vicinity to Cuba, to the capes of Florida, to New Orleans, and, indeed, to our whole southwestern coast, it would be dangerous to our peace and security if it should become a colony of any European nation.[16]

### 3. President Johnson and European Intervention in Mexico (1865–66)

In 1861 and 1862, during the Civil War, France, Great Britain and Spain invaded Mexico. After the British and Spanish withdrew, Emperor Napoleon III of France selected Archduke Maximilian of Austria as Emperor of Mexico. Maximilian accepted on the basis of "proof" given by Napoleon and by Mexican exiles in France that the Mexican people wanted him. Because of its involvement in the Civil War, the United States could not interfere. After the war, Secretary of State Seward reaffirmed the principles of the Monroe Doctrine, although he did not refer to it by name.[17] The House of Representatives then adopted a resolution declaring that

it does not accord with the policy of the United States to acknowledge any monarchical government erected on the ruins of any republican government in America under the auspices of any European power.[18]

In his First Annual Message to Congress on December 4, 1865, President Johnson said in this connection:

From the moment of the establishment of our free Constitution the civilized world has been convulsed by revolutions in the interests of democracy or of monarchy, but through all those revolutions the United States have wisely and firmly refused to become propagandists of republicanism. It is the only government suited to our condition; but we have never sought to impose it on others, and we have consistently followed the advice of Washington to recommend it only by the careful preservation and prudent use of the blessing. . . . Twice, indeed, rumors of the invasion of some parts of America in the interest of monarchy have prevailed; twice my predecessors have had occasion to announce the views of this nation in respect to such

---

[16] 5 Richardson, *supra* note 15, 2431, 2431–32.

[17] Julius W. Pratt, *A History of United States Foreign Policy* 342 (1955).

[18] *Id.*

interference. On both occasion the remonstrance of the United States was respected from a deep conviction on the part of European Governments that the system of noninterference and mutual abstinence from propagandism was the true rule for the two hemispheres. . . . We should regard it as a great calamity to ourselves, to the cause of good government, and to the peace of the world should any European power challenge the American people, as it were, to the defense of republicanism against foreign interference. We can not foresee and are unwilling to consider what opportunities might present themselves, what combinations might offer to protect ourselves against designs inimical to our form of government. The United States desire to act in the future as they have ever acted heretofore; they never will be driven from that course but by the aggression of European powers, and we rely on the wisdom and justice of those powers to respect the system of noninterference which has so long been sanctioned by time, and which by its good results has approved itself to both continents.[19]

Finally, in 1866, the French Government withdrew its forces from Mexico and the Mexicans overthrew the Maximilian regime in 1867.

## 4. President Hayes and the Isthmian Canal Question (1880)

In 1879 it appeared imminent that a private French company was about to undertake the construction of a canal across the Panama Isthmus. The United States feared that control of the canal would fall into the hands of the French Government just as the British Government had earlier obtained control of the Suez Canal. On March 8, 1880, President Hayes sent a message to Congress expressing his opposition to the project as follows:

The United States can not consent to the surrender of this control to any European power or to any combination of European powers. If existing treaties between the United States and other nations or if the rights of sovereignty or property of other nations stand in the way of this policy—a contingency which is not apprehended—suitable steps should be taken by just and liberal negotiations to promote and establish the American policy on this subject consistently with the rights of the nations to be affected by it.

The capital invested by corporations or citizens of other countries in such an enterprise must in a great degree look for protection to

---

[19] 8 Richardson, *supra* note 15, 3551, 3566–67.

one or more of the great powers of the world. No European power can intervene for such protection without adopting measures on this continent which the United States would deem wholly inadmissible. If the protection of the United States is relied upon, the United States must exercise such control as will enable this country to protect its national interests and maintain the rights of those whose private capital is embarked in the work.

An interoceanic canal across the American Isthmus will essentially change the geographical relations between the Atlantic and Pacific coasts of the United States and between the United States and the rest of the world. It would be the great ocean thoroughfare between our Atlantic and our Pacific shores, and virtually a part of the coast line of the United States. Our merely commercial interest in it is greater than that of all other countries, while its relations to our power and prosperity as a nation, to our means of defense, our unity, peace, and safety, are matters of paramount concern to the people of the United States. No other great power would under similar circumstances fail to assert a rightful control over a work so closely and vitally affecting its interest and welfare.

Without urging further the grounds of my opinion, I repeat, in conclusion, that it is the right and the duty of the United States to assert and maintain such supervision and authority over any interoceanic canal across the isthmus that connects North and South America as will protect our national interests. This, I am quite sure, will be found not only compatible with but promotive of the widest and most permanent advantage to commerce and civilization.[20]

In addition, both Houses of Congress formally protested against any canal which might be built by foreign capital or controlled by foreign nations.[21]

### 5. President Cleveland's Intervention in the Venezuela Boundary Dispute (1895)

In President Cleveland's second administration, he invoked the Monroe Doctrine in the British-Venezuela dispute concerning the boundaries between British Guiana and Venezuela. The British being unwilling to arbitrate the matter, the President in a special message to Congress on December 17, 1895, announced that under the principles of the Monroe Doctrine the United States would designate a

---

[20] 10 Richardson, *supra* note 15, 4537, 4537–38.

[21] Thomas A. Bailey, *A Diplomatic History of the American People* 396–97 (1955).

commission which would itself investigate the boundary and render a report.[22] In the event the report favored Venezuela in the dispute, he said,

> it will, in my opinion, be the duty of the United States to resist by every means in its power as a willful aggression upon its rights and interests, the appropriation by Great Britain of any lands or the exercise of governmental jurisdiction over any territory which after investigation we have determined of right belongs to Venezuela.
>
> In making these recommendations I am fully alive to the responsibility incurred and keenly realize all the consequences that may follow.[23]

He further said:

> [I]t may not be amiss to suggest that the doctrine upon which we stand is strong and sound, because its enforcement is important to our peace and safety as a nation, and is essential to the integrity of our free institutions and the tranquil maintenance of our distinctive form of government. It was intended to apply to every stage of our national life and can not become obsolete while our Republic endures. If the balance of power is justly a cause for jealous anxiety among the Governments of the Old World and a subject for our absolute noninterference, none the less is an observance of the Monroe doctrine of vital concern to our people and their Government.
>
> Assuming, therefore, that we may properly insist upon this doctrine without regard to "the state of things in which we live" or any changed conditions here or elsewhere, it is not apparent why its application may not be involved in the present controversy.
>
> If a European power by an extension of its boundaries takes possession of the territory of one of our neighboring Republics against its will and in derogation of its rights, it is difficult to see why to that extent such European power does not thereby attempt to extend its system of government to that portion of this continent which is thus taken. This is the precise action which President Monroe declared to be "dangerous to our peace and safety," and it can make no differ-

---

[22] 13 Richardson, *supra* note 15, 6087, 6090 (1909).

[23] *Id.* at 6090.

ence whether the European system is extended by an advance of frontier or otherwise.[24]

Addressing himself to the contention that the Monroe Doctrine found no support in any principle of international law derived from the general consent of nations, the President stated:

> Practically the principle for which we contend has peculiar, if not exclusive, relation to the United States. It may not have been admitted in so many words to the code of international law, but since in international councils every nation is entitled to the rights belonging to it, if the enforcement of the Monroe doctrine is something we may justly claim it has its place in the code of international law as certainly and securely as if it were specifically mentioned; and when the United States is a suitor before the high tribunal that administers international law the question to be determined is whether or not we present claims which the justice of that code of law can find to be right and valid.
>
> The Monroe doctrine finds its recognition in those principles of international law which are based upon the theory that every nation shall have its rights protected and its just claims enforced.[25]

The British Prime Minister acknowledged that the interests of the United States in the Caribbean area were as natural as British concern would be over any attempt by a great European power to secure control over the Channel ports of Belgium and the Netherlands. The British finally submitted the controversy to arbitration.[26]

### 6. Cuba—The Platt Amendment—President Theodore Roosevelt (1901)

Congress, on March 1, 1901, passed the Platt Amendment to the Army appropriation bill. 34 Cong. Rec. 3332–84. The amendment defined the relations between Cuba and the United States following the establishment of the Cuban republic. It provided that in order to permit the United States to maintain Cuba's independence, and to protect its people, Cuba would sell or lease to the United States lands necessary for coaling or naval stations at certain specified points, to be agreed upon with the President of the United States; and that Cuba would embody the foregoing provisions in a permanent treaty with the United States.[27]

---

[24] *Id.* at 6088.

[25] *Id.* at 6088–89.

[26] Louis Martin Sears, *A History of American Foreign Relations* 431 (1938).

[27] Act of Mar. 2, 1901, ch. 803, 31 Stat. 895, 897–98.

The amendment in effect contemplated a United States quasi-protectorate over Cuba. Later that year Cuba incorporated these provisions as an appendix to its constitution.[28]

In his message to Congress on December 3, 1901, President Theodore Roosevelt discussed the Monroe Doctrine in relation to Cuba. The President said:

> The Monroe Doctrine should be the cardinal feature of the foreign policy of all the nations of the two Americas, as it is of the United States. Just seventy-eight years have passed since President Monroe in his Annual Message announced that "The American continents are henceforth not to be considered as subjects for future colonization by any European power." In other words, the Monroe Doctrine is a declaration that there must be no territorial aggrandizement by any non-American power at the expense of any American power on American soil. It is in no wise intended as hostile to any nation in the Old World. Still less is it intended to give cover to any aggression by one New World power at the expense of any other. It is simply a step, and a long step, toward assuring the universal peace of the world by securing the possibility of permanent peace on this hemisphere.

> During the past century other influences have established the permanence and independence of the smaller states of Europe. Through the Monroe Doctrine we hope to be able to safeguard like independence and secure like permanence for the lesser among the New World nations.

> . . . .

> Our attitude in Cuba is a sufficient guaranty of our own good faith. We have not the slightest desire to secure any territory at the expense of any of our neighbors. We wish to work with them hand in hand, so that all of us may be uplifted together, and we rejoice over the good fortune of any of them, we gladly hail their material prosperity and political stability, and are concerned and alarmed if any of them fall into industrial or political chaos. We do not wish to see any Old World military power grow up on this continent, or to be compelled to become a military power ourselves. The peoples of the Americas can prosper best if left to work out their own salvation in their own way.[29]

---

[28] *See* Dep't of State, *Papers Relating to the Foreign Relations of the United States* 243, 244 (1905).

[29] 14 Richardson, *supra* note 15, 6641, 6664–65 (1909).

In the Cuban-American treaty of 1903,[30] Cuba agreed not to enter into any treaty or other compact with a foreign power which would impair the independence or permit military or naval control by a foreign power. It also agreed that the United States should have the right to intervene to preserve Cuban independence. The United States, for its defense as well as that of Cuba, was to have the right to maintain naval bases in Cuba. Pursuant to the treaty, a permanent naval base was established at Guantanamo.[31]

In 1905 the President addressed a message to Congress, stating:

> One of the most effective instruments for peace is the Monroe Doctrine as it has been and is being gradually developed by this Nation and accepted by other nations. No other policy could have been as efficient in promoting peace in the Western Hemisphere and in giving to each nation thereon the chance to develop along its own lines. If we had refused to apply the doctrine to changing conditions it would not be completely outworn, would not meet any of the needs of the present day, and, indeed, would probably by this time have sunk into complete oblivion. It is useful at home, and is meeting with recognition abroad because we have adapted our application of it to meet the growing and changing needs of the hemisphere. When we announce a policy such as the Monroe Doctrine we thereby commit ourselves to the consequences of the policy, and those consequences from time to time alter. It is out of the question to claim a right and yet shirk the responsibility for its exercise. Not only we, but all American republics who are benefited by the existence of the doctrine, must recognize the obligations each nation is under as regard foreign peoples no less than its duty to insist upon its own rights.

> That our rights and interests are deeply concerned in the maintenance of the doctrine is so clear as hardly to need argument. This is especially true in view of the construction of the Panama Canal. As a mere matter of self-defense we must exercise a close watch over the approaches to this canal; and this means that we must be thoroughly alive to our interests in the Caribbean Sea.

---

[30] U.S.-Cuba, May 22, 1903, 33 Stat. 2248.

[31] Lease of Coaling or Naval Stations to the United States, U.S.-Cuba, Feb. 23, 1903, *in* Dep't of State, *Papers Relating to the Foreign Relations of the United States* 350 (1904); Lease to the United States by the Government of Cuba of Certain Areas of Land and Water for Naval or Coaling Stations in Guantanamo and Bahia Honda, U.S.-Cuba, Oct. 2, 1903, *in* Dep't of State, *Papers Relating to the Foreign Relations of the United States* 351 (1904).

There are certain essential points which must never be forgotten as regards the Monroe Doctrine. In the first place we must as a Nation make it evident that we do not intend to treat it in any shape or way as an excuse for aggrandizement on our part at the expense of the republics to the south. We must recognize the fact that in some South American countries there has been much suspicion lest we interpret the Monroe Doctrine as in some way inimical to their interests, and we must try to convince all the other nations of this continent once and for all that no just and orderly Government has anything to fear from us. . . . It must be understood that under no circumstances will the United States use the Monroe Doctrine as a cloak for territorial aggression. We desire peace with all the world, but perhaps most of all with the other peoples of the American Continent.[32]

### 7. Elihu Root on the Monroe Doctrine (1914)

Elihu Root was President Roosevelt's Secretary of State from 1905 to 1909. Subsequently Root became President of the American Society of International Law. In his exposition in 1914 in the American Journal of International Law of the Monroe Doctrine, he said:

No one ever pretended that Mr. Monroe was declaring a rule of international law or that the doctrine which he declared has become international law. It is a declaration of the United States that certain acts would be injurious to the peace and safety of the United States and that the United States would regard them as unfriendly. The declaration does not say what the course of the United States will be in case such acts are done. That is left to be determined in each particular instance.

. . . .

The doctrine is not international law but it rests upon the right of self-protection and that right is recognized by international law. The right is a necessary corollary of independent sovereignty. It is well understood that the exercise of the right of self-protection may and frequently does extend in its effect beyond the limits of the territorial jurisdiction of the state exercising it. The strongest example probably would be the mobilization of any army by another Power immediately across the frontier. Every act done by the other Power may be

---

[32] 15 Richardson, *supra* note 15, 6973, 6994–95.

within its own territory. Yet the country threatened by the state of facts is justified in protecting itself by immediate war. The most common exercise of the right of self-protection outside of a state's own territory and in time of peace is the interposition of objection to the occupation of territory, of points of strategic military or maritime advantage, or to indirect accomplishment of this effect by dynastic arrangement. For example, the objection of England in 1911 to the occupation of a naval station by Germany on the Atlantic coast of Morocco; the objection of the European Powers generally to the vast forces of Russia extending its territory to the Mediterranean; the revision of the Treaty of San Stefano by the Treaty of Berlin; the establishment of buffer states; the objection to the succession of a German prince to the throne of Spain; the many forms of the eastern question; the centuries of struggle to preserve the balance of power in Europe; all depend upon the very same principle which underlies the Monroe Doctrine; that is to say, upon *the right of every sovereign state to protect itself by preventing a condition of affairs in which it will be too late to protect itself.* Of course each state must judge for itself when a threatened act will create such a situation. If any state objects to a threatened act and the reasonableness of its objection is not assented to, the efficacy of the objection will depend upon the power behind it.[33]

### 8. The Magdalena Bay Episode (1912)

In 1912 it was asserted that a Japanese private fishing company was about to lease from the Government of Mexico an extensive tract of land on the shore of Magdalena Bay, in Lower California, Mexico. This land could be used as the site of a naval base capable of intercepting communications between the Pacific coast of the United States and the Panama Canal. The Senate adopted a resolution proposed by Senator Lodge as follows:

> *Resolved*, That when any harbor or other place in the American continents is so situated that the occupation thereof for naval or military purposes might threaten the communications or the safety of the United States, the Government of the United States could not see without grave concern the possession of such harbor or other place by any corporation or association which has such a relation to anoth-

---

[33] Root, *supra* note 1, at 431–32 (emphasis added).

er Government, not American, as to give that Government practical power of control for naval or military purposes.[34]

### 9. President Wilson and Vera Cruz (1914)

In 1914 President Wilson was notified that a German merchantman was approaching Vera Cruz, Mexico, with a large cargo of arms which it was suspected the Huerto Government intended to use against the United States. The President ordered American forces to seize the port; a battle ensued, and the objective of preventing the arms from reaching Huerto's forces was attained.[35] American forces then occupied the city, and a proclamation was issued prohibiting the importation of arms into Mexico.

This armed intervention terminated diplomatic relations between the United States and Mexico. However, Argentina, Brazil and Chile offered to mediate the controversy and President Wilson accepted.

### 10. Charles Evans Hughes and the Monroe Doctrine (1923)

Mr. Hughes, Secretary of State in the Harding Administration, delivered an address in 1923 on the Monroe Doctrine before the American Bar Association which is often cited as an authoritative statement. He said:

> It is not my purpose to review the historical applications of what is called the Monroe doctrine or to attempt to harmonize the various redactions of it. Properly understood, it is opposed (1) to any non-American action encroaching upon the political independence of American States under any guise and (2) to the acquisition in any manner of the control of additional territory in this hemisphere by any non-American power.
>
> The Monroe doctrine is not a legislative pronouncement; it has been approved by action of Congress, but it does not rest upon any congressional sanction. It has had the implied indorsement of the treaty-making power in the reservations to the two Hague conventions of 1899 and 1907, but it is not defined by treaty and does not draw its force from any international agreement. It is not like a constitutional provision deriving its authority from the fact that it is a part of the organic law transcending and limiting executive and legislative power. It is not a part of international law, maintained by the consent of the civilized powers and alterable only at their will. It is a

---

[34] 48 Cong. Rec. 10,045–46 (1912).

[35] Bailey, *supra* note 21, at 555–60.

policy declared by the Executive of the United States and repeated in one form and another by Presidents and Secretaries of State in the conduct of our foreign relations. Its significance lies in the fact that in its essentials, as set forth by President Monroe and as forcibly and repeatedly asserted by our responsible statesmen, it has been for 100 years, and continues to be, an integral part of our national thought and purpose, expressing a profound conviction which even the upheaval caused by the Great War, and our participation in that struggle upon European soil, has not uprooted or fundamentally changed.[36]

Mr. Hughes summarized the principles of the Doctrine as follows:

First. The Monroe doctrine is not a policy of aggression; it is a policy of self-defense. It was asserted at a time when the danger of foreign aggression in this hemisphere was very real, when the new American States had not yet established a firm basis of independent national life, and we were menaced by threats of Old World powers directed against republican institutions. But the achievements of the century have not altered the scope of the doctrine or changed its basis. It still remains an assertion of the principle of national security. As such, it is obviously not exclusive. Much time has been wasted in the endeavor to find in the Monroe doctrine either justification, or the lack of it, for every governmental declaration or action in relation to other American States. Appropriate action for our defense may always be taken, and our proper influence to promote peace and good will may always be exerted, with the use of good offices to that end, whether or not the particular exigency comes within the range of the specific declarations which constitute the doctrine.[37]

. . . .

Second. As the policy embodied in the Monroe doctrine is distinctively the policy of the United States, the Government of the United States reserves to itself its definition, interpretation, and application. This Government has welcomed the recognition by other governments of the fact and soundness of this policy and of the appropriateness of its application from time to time. Great powers have signified their acquiescence in it. But the United States has not been disposed to enter into engagements which would have the effect of

---

[36] Charles Evan Hughes, Observations on the Monroe Doctrine, *in* Alvarez, *supra* note 14, at 413, 417–18.

[37] *Id.* at 418–19.

submitting to any other power or to any concert of powers the determination either of the occasions upon which the principles of the Monroe doctrine shall be invoked or of the measures that shall be taken in giving it effect. This Government has not been willing to make the doctrine or the regulation of its enforcement the subject of treaties with European powers; and, while the United States has been gratified at expressions on the part of other American States of their accord with our Government in its declarations with respect to their independence and at their determination to maintain it, this Government in asserting and pursuing its policy has commonly avoided concerted action to maintain the doctrine, even with the American Republics. As President Wilson observed: "The Monroe doctrine was proclaimed by the United States on her own authority. It always has been maintained and always will be maintained upon her own responsibility."[38]

. . . .

Third. The policy of the Monroe doctrine does not infringe upon the independence and sovereignty of other American States. Misconception upon this point is the only disturbing influence in our relations with Latin American States.[39]

This notion springs from a misunderstanding of the doctrine itself and of our national sentiment and purpose . . . .

The Monroe doctrine does not attempt to establish a protectorate over Latin American States. . . .

. . . That ground [of the declaration] is found in the recognized right which every State enjoys, and the United States no less than any other, to object to acts done by other powers which threaten its own safety. The United States has all the rights of sovereignty, as well as any other power; we have lost none of our essential rights because we are strong, and other American States have gained none either because of increasing strength or relative weakness. . . .[40]

. . . .

---

[38] *Id.* at 419–20.

[39] *Id.* at 421.

[40] *Id.* at 422.

Fourth. There are, indeed, modern conditions and recent events which can not fail to engage our attention. We have grown rich and powerful, but we have not outgrown the necessity, in justice to ourselves and without injustice to others, of safeguarding our future peace and security. . . .[41]

. . . .

Fifth. It is apparent that the Monroe doctrine does not stand in the way of Pan American cooperation; rather it affords the necessary foundation for that cooperation in the independence and security of American States.[42]

### 11. The Clark Memorandum and President Hoover (1928)

In 1928, a *Memorandum on the Monroe Doctrine* was prepared by J. Reuben Clark, then Undersecretary of State, for use by the Secretary of State. It repudiated the (Theodore) "Roosevelt Corollary" that "in case of financial or other difficulties in weak Latin American countries, the United States should attempt an adjustment thereof lest European Governments should intervene, and intervening should occupy territory."[43] Clark's thesis was that this was not "justified by the terms of the Monroe Doctrine, however much it may be justified by the application of the doctrine of self-preservation."[44] Clark's conclusions about the Doctrine were as follows:

> The Doctrine does not concern itself with purely inter-American relations; it has nothing to do with the relationship between the United States and other American nations, except where other American nations shall become involved with European governments in arrangements which threaten the security of the United States, and even in such cases, the Doctrine runs against the European country, not the American nation, and the United States would primarily deal thereunder with the European country and with the American nation concerned. The Doctrine states a case of the United States vs. Europe, and not of the United States vs. Latin America. Furthermore, the fact should never be lost to view that in applying this Doctrine during the period of one hundred years since it was announced, our Government has over and over again driven it in as a shield between

---

[41] *Id.* at 424.

[42] *Id.* at 431.

[43] J. Reuben Clark, Undersecretary of State, *Memorandum on the Monroe Doctrine*, Dep't of State Publication No. 37, at xxiii (Dec. 17, 1928).

[44] *Id.* at xxiii–xxiv.

Europe and the Americas to protect Latin America from the political and territorial thrusts of Europe; and this was done at times when the American nations were weak and struggling for the establishment of stable, permanent governments; when the political morality of Europe sanctioned, indeed encouraged, the acquisition of territory by force; and when many of the great powers of Europe looked with eager, covetous eyes to the rich, undeveloped areas of the American Hemisphere. Nor should another equally vital fact be lost sight of, that the United States has only been able to give this protection against designing European powers because of its known willingness and determination, if and whenever necessary, to expend its treasure and to sacrifice American life to maintain the principles of the Doctrine. So far as Latin America is concerned, the Doctrine is now, and always has been, not an instrument of violence and oppression, but an unbought, freely bestowed, and wholly effective guaranty of their freedom, independence, and territorial integrity against the imperialistic designs of Europe.[45]

In embarking on a "Good Neighbor" policy, it has been said that President Hoover gave his support to the views expressed by Clark.[46]

### 12. President Franklin D. Roosevelt—Abrogation of the Platt Amendment—the Inter-American Conference—Canada (1934–38)

The Good Neighbor Policy was followed and implemented by President Franklin D. Roosevelt in an attempt to make the policy of non-intervention acceptable in both hemispheres. As an integral part of the new policy, the United States decided to release Cuba from the provisions of the Platt Amendment. This was accomplished by a treaty between the United States and Cuba signed in May 1934.[47] Article III of this treaty, which continued the right of the United States to maintain a naval base at Guantanamo, provided as follows:

Until the two contracting parties agree to the modification or abrogation of the stipulations of the agreement in regard to the lease to the United States of America of lands in Cuba for coaling and naval stations signed by the President of the Republic of Cuba on February 16, 1903, and by the President of the United States of America on the 23d day of the same month and year, the stipulations of that agreement with regard to the naval station of Guantanamo shall con-

---

[45] *Id.* at xxiv–xxv.

[46] Bailey, *supra* at note 21, at 681.

[47] Dep't of State, Treaty Info. Bull. No. 56 (May 31, 1934).

tinue in effect. The supplementary agreement in regard to naval or coaling stations signed between the Governments on July 2, 1903, also shall continue in effect in the same form and on the same conditions with respect to the naval station of Guantanamo. So long as the United States of America shall not abandon the said naval station of Guantanamo or the two Governments shall not agree to a modification of its present limits, this station shall continue to have the territorial area that it now has, with the limits that it has on the date of the signature of the present Treaty.[48]

In 1936 President Roosevelt proposed a special Inter-American peace conference. At this conference, held at Buenos Aires, he invited all American states to resort to the principles of the Monroe Doctrine in dealing with aggressive threats by non-American totalitarian states and declared that such states seeking "to commit acts of aggression against us will find a Hemisphere wholly prepared to consult together for our mutual safety and our mutual good."[49]

In 1938 Canada supported President Roosevelt's statement in a speech at Kingston, Canada, that "the people of the United States will not stand idly by if dominion of Canadian soil is threatened by any other empire."[50]

## 13. Congressional Resolution of 1940 on Transfers of Territory in the Western Hemisphere

The collapse of the Low Countries, France, and Denmark in 1940 aroused serious concern in the Americas. Seizure by Hitler of the American possessions of these countries, it was felt, would pose not only a grave threat to the Panama Canal and the Caribbean trade routes but also to the mainland of the United States. Congress promptly passed a resolution expressing opposition to the transfer of territory in the Western hemisphere from one non-American power to another. The resolution, which had been drafted by the Department of State with the President's approval, declared:

That the United States would not recognize any transfer, and would not acquiesce in any attempt to transfer, any geographic region of this hemisphere from one non-American power to another non-American power; and

That if such transfer or attempt to transfer should appear likely, the United States shall, in addition to other measures, immediately

---

[48] *Id.* at 30–31.

[49] Bailey, *supra* note 21, at 684.

[50] *Id.* at 686.

consult with the other American republics to determine upon the steps which should be taken to safeguard their common interests.[51]

## 14. The Greenland Action (1941)

In April 1941, United States forces occupied the Danish possession of Greenland. This action was taken pursuant to an agreement signed by Secretary of State Hull, acting on behalf of the United States, and the Danish Minister in Washington.[52] The agreement noted the danger that Greenland might be converted into a base of aggression against American states and recognized the responsibility of the United States to assist in the maintenance of the existing status of Greenland. Article I of the Agreement provided:

> The Government of the United States of America reiterates its recognition of and respect for the sovereignty of the Kingdom of Denmark over Greenland. Recognizing that as a result of the present European war there is danger that Greenland may be converted into a point of aggression against nations of the American Continent, the Government of the United States of America, having in mind its obligations under the Act of Habana signed on July 30, 1940, accepts the responsibility of assisting Greenland in the maintenance of its present status.[53]

The Hitler-dominated government in Denmark disapproved the agreement as contrary to its constitution. Mr. Hull replied that the Denmark government was acting under duress and refused to acknowledge that the agreement was invalid.

## 15. Act of Havana of 1940—Implementing Treaty of 1942

After the defeat of France, representatives of the American states, convening in Havana in July 1940, adopted the Act of Havana, by which they agreed to prevent by collective action, or by unilateral action if necessary, changes in the control of territory in the Western Hemisphere as a result of the European hostilities. The Act was adopted in connection with the negotiation of a treaty thereafter ratified by fourteen states—the necessary two-thirds—in 1942.[54] It provided that if it appeared that American possessions of European powers might fall into the hands of any Axis power, they could be taken over and administered jointly by the American republics as trustees. In the event that the situation called for it, an individual state, such as the United States, could assume temporary control.

---

[51] Logan, *supra* note 11, at 327.

[52] Agreement Relating to the Defense of Greenland, 4 Dep't of State Bull. 443, 445–47 (1941).

[53] *Id.* at 445.

[54] Samuel Flagg Bemis, *The Latin American Policy of the United States* 367–73 (1943).